**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division**

| | | |
|---|---|---|
| _____ | : | |
| U.S. BANK NATIONAL ASSOCIATION, | : | C.A. No. 1:10-cv-00678-HHK |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| PATRIOT-BSP CITY CENTER II, LLC, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR APPOINTMENT OF A RECEIVER AND FOR A PRELIMINARY INJUNCTION

Defendants Patriot-BSP City Center II, LLC, Patriot-BSP City Center III, LLC, and

Patriot-BSP City Center IV, LLC, through undersigned counsel, respectfully opposes the

Plaintiff's Motion for Appointment of a Receiver and for a Preliminary Injunction and hereby

submit this Memorandum and the attached Statement of Points and Authorities in opposition

thereof.

Respectfully submitted,

**KASS, MITEK & KASS, PLLC**

BY:     /s/  Benny L. Kass
Benny L. Kass (D.C. Bar No. 025155)
1050 Seventeenth Street, N.W., Suite 1100
Washington, D.C. 20036-5596
(202) 659-6500
*Attorneys for Defendants Patriot-BSP City Center
II, LLC, Patriot-BSP City Center III, LLC, and
Patriot-BSP City Center IV, LLC*

Dated: May 24, 2010

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Memorandum and the attached Statement of Points and Authorities in opposition to the Plaintiff's Motion for Appointment of a Receiver and for a Preliminary Injunction were served this 24th day of May, 2010 via the Court's electronic filing system upon the following counsel:

M. Roy Goldberg, Esq.
Sheppard Mullin Richter & Hampton LLP
1300 I Street, NW
11th Floor-East
Washington, DC 20005

____/s/  Benny L. Kass
Benny L. Kass, Esq.

## CERTIFICATE FOR CONSENT

I hereby certify that despite diligent efforts I was unable to obtain the consent for the relief requested herein from any of the named Defendants and accordingly must assume they do not consent.

____/s/  Benny L. Kass
Benny L. Kass, Esq.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division**

―――――――――――――――――――――――――――――        :
                                                            :
U.S. BANK NATIONAL ASSOCIATION,        :        C.A. No. 1:10-cv-00678-HHK
                                                            :
        Plaintiff,                              :
                                                            :
        v.                                      :
                                                            :
PATRIOT-BSP CITY CENTER II, LLC, *et al.,*     :
                                                            :
        Defendants.                        :
―――――――――――――――――――――――――――――        :

**STATEMENT OF POINTS AND AUTHORITIES IN OPPOSITION
TO PLAINTIFF'S MOTION FOR APPOINTMENT OF A
RECEIVER AND FOR A PRELIMINARY INJUNCTION**

Defendants Patriot-BSP City Center II, LLC, Patriot-BSP City Center III, LLC, and

Patriot-BSP City Center IV, LLC, through undersigned counsel, respectfully submit this

Statement of Points and Authorities in opposition to plaintiff's Motion for Appointment of a

Receiver and for a Preliminary Injunction.

**I.    INTRODUCTION**

Plaintiff filed this action, which asserts no claims arising under federal law, in United

States District Court, purporting to invoke this Court's diversity jurisdiction pursuant to 28

U.S.C. § 1332.  Plaintiff has failed properly to allege both its own citizenship and that of each of

the defendants.  Because the Court is presumed, as a matter of law, to lack subject-matter

jurisdiction over plaintiff's claims, and because no well-pleaded facts set forth in the Complaint

tend to negate such presumption, the Court must dismiss this action pursuant to Fed.R.Civ.P.

12(b)(1), 12(b)(6), and 12(h)(3).

Moreover, each of the defendants is a limited liability company, which, as a matter of law, is ascribed the citizenship of each of its members.  Each of the three defendants is owned by a fourth limited liability company which, in turn, is 89% owned by a fifth limited liability company which, in turn, is 96% owned by an arm of the state of California.  Because the state of California owns more than 85% of each defendant and, as such, is the real party in interest in this action, and because the state of California is not a citizen of any state, this is not an action between citizens of different states (within the meaning of the diversity jurisdiction statute).  The action must accordingly be dismissed for lack of subject-matter jurisdiction.[1]

Plaintiff has now filed a motion for appointment of a receiver (for defendants' real property) and for a preliminary injunction (preventing defendants from undertaking certain actions with respect to such real property).  Plaintiff's motion must be denied because this Court lacks jurisdiction over this action and, perforce, over the motion.  *See, e.g., Mintzer v. Arthur L. Wright & Co.*, 263 F.2d 823, 824 (3d Cir. 1959) ("The appointment of a receiver is an equitable remedy of rather drastic nature available at the discretion of the court having jurisdiction of the subject matter"); 13-66 MOORE'S FEDERAL PRACTICE § 66.04 ("In order to appoint a receiver, a federal court must have subject-matter jurisdiction").

Plaintiff's motion for extraordinary preliminary equitable relief must also be denied because plaintiff has failed *in toto* to demonstrate that the legal remedies available to plaintiff if it succeeds in this action will be inadequate.  In fact, plaintiff does not seek any final equitable relief; it seeks only money damages.  Plaintiff, a secured lender, premises its *entire* motion on the assertion that the balances purportedly owed by defendants "significantly exceed the current fair market value" of the real property which secures the loan.  Plaintiff's Motion at 1.  Rather

---

[1]   Defendants have filed a separate motion to dismiss this action due to lack of subject matter jurisdiction, which remains pending.

than offer any facts, evidence, or expert testimony in support of this assertion, plaintiff seeks to establish this key "fact" merely by repeating it, over and over and over again. *Nothing* in the record indicates that defendants' real property, which is held in deed of trust for plaintiff's benefit, is insufficient to secure the full amount which plaintiff contends is owed. Given that plaintiff has served notice of its intent to sell such property at a foreclosure sale on June 8, 2010, and that there is no reason to expect that the proceeds of such sale will be insufficient to satisfy the loan, there is simply no likelihood of harm – irreparable or otherwise – sufficient to support plaintiff's motion for extraordinary equitable relief. There is thus no basis for this Court – which lacks jurisdiction – to exercise its discretion in favor of the appointment of a receiver or the entry of an injunction.

## II.   STATEMENT OF FACTS

### A.   Structure and Membership of Parties to this Action

Plaintiff alleges that it is a "national banking association organized under the laws of the United States of America, with its headquarters located in Cincinnati, Ohio and its principal place of business in Minneapolis, Minnesota." Complaint, ¶4.[2] Plaintiff alleges that each defendant in this action "is a Delaware limited liability company and, upon information and belief, has its principal place of business in Pennsylvania." *Id.*, ¶¶5-7. The Complaint contains no allegations regarding the identity, domicile, place of residence, or citizenship of any member of any of the three defendant limited liability companies. Nor does the Complaint assert any claims arising under the Constitution, laws, or treaties of the United States (within the meaning of 28 U.S.C. § 1331). Plaintiff asserts that this Court "has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship . . ." *Id.*, ¶8.

---

[2]    A true and correct copy of plaintiff's Verified Complaint and Petition for Appointment of a Receiver (the "Complaint") is attached hereto as Exhibit A.

3

The sole member of each defendant is Patriot-BSP City Center Holdings, LLC ("PBCC Holdings"), a Delaware limited liability company.  *See* Defendants' Limited Liability Company Agreements, true and correct copies of which are attached hereto as Exhibits B, C, and D.  The sole members of PBCC Holdings, in turn, are Patriot City Center Associates, LP ("PCCA"), a Pennsylvania limited partnership, and Buchanan Urban Investors II, LLC ("BUI II"), a California limited liability company.  *See* PBCC Holdings' Limited Liability Company Agreement, a true and correct copy of which is attached hereto as Exhibit E.

PCCA's sole general partner is Patriot City Center, Inc., a Pennsylvania corporation with its principal place of business in Pennsylvania.  *See* PCCA's Agreement of Limited Partnership, a true and correct copy of which is attached hereto as Exhibit F, at 1 and 29.  Each and every limited partner of PCCA is a natural person and a citizen and domiciliary of Pennsylvania.  *See id* at 29.

BUI II's members are Buchanan Street Advisors, LP ("BSA"), a California limited partnership, Buchanan Investors II, LP ("BI II"), a Delaware limited partnership, and the State of California Public Employees' Retirement System ("CalPERS"), a unit of the State and Consumer Services Agency of the State of California.  *See* Fourth Amendment to BUI II's Limited Liability Company Agreement, a true and correct copy of which is attached hereto as Exhibit G.  Through BUI II and PBCC Holdings, CalPERS indirectly owns an **85.44%** beneficial interest in each of the defendant limited liability companies.  *See id*., § 3 (reaffirming CalPERS' 96% ownership interest in BUI II); PBCC Holdings Limited Liability Company Agreement (Exhibit E hereto), at 10 (noting BUI II's 89% ownership interest in PBCC Holdings).

BSA's sole general partner is Buchanan Street Partners, Inc., a California corporation with its principal place of business in California.  *See* Amendment to BSA's Amended and

Restated Agreement of Limited Partnership, a true and correct copy of which is attached hereto as Exhibit H.  BSA's sole limited partners are Buchanan Co-Investors, LLC ("BCI"), a Delaware limited liability company, The Robert S. Brunswick and Kathleen J. Brunswick Revocable Family Trust dated January 28, 2000 (the "Brunswick Trust"), and The Timothy and Wendy Ballard Revocable Family Trust dated January 28, 2000 (the "Ballard Trust").  *See id.*  Plaintiff has not pleaded, and defendants are not aware of, the identity or citizenship of any member of BCI or any of BI II's limited partners.  Nor did plaintiff plead or are defendants aware of the citizenship of the respective trustees of the Brunswick Trust or the Ballard Trust.

### B.  Factual Background[3]

On or about January 9, 2008, plaintiff, as "Agent" for Lenders, and as a Lender, entered into a loan agreement with defendants, as Borrower (the "Loan Agreement," attached to plaintiff's Motion as Exhibit 1.B).  Pursuant to the Loan Agreement, plaintiff committed to lend defendants up to $66.6 million (the "Loan") in connection with defendants' purchase, construction, renovation, and improvement of the land and improvements located at 1401-1403 New York Avenue, N.E., Washington, D.C., more commonly known as the site of The Hecht Company Warehouse, an art deco "Streamline Moderne" style building listed on the National Registry of Historic Places (the "Property").

The Loan Agreement provided that defendants would repay the principal amount of the Loan on the Maturity Date of January 10, 2011, unless extended as provided for therein.  It also provided for payment of interest on the outstanding principal balance on a monthly basis.

---

[3]  Except as set forth below, the facts set forth in this Section II.B of defendants' statement of points and authorities in opposition to plaintiff's Motion are as set forth in the Verified Complaint filed in the Superior Court of the District of Columbia in the action styled *Patriot-BSP City Center II, LLC et al. v. U.S. Bank, N.A., et al., 2010 CA 003575 R(RP)*, a true and correct copy of which is attached hereto as Exhibit I.

To secure the Loan, defendants executed a Purchase Money Deed of Trust (the "Deed of Trust," attached to plaintiff's Motion as Exhibit 1.D) in favor of Lawyers Title Realty Services, Inc. ("Lawyers Title") as Trustee for the benefit of plaintiff.  The Deed of Trust purports to empower Lawyers Title to sell the Property at a foreclosure sale in accordance with District of Columbia law only upon: (i) a default by defendants in the payment of principal or interest under the Loan Agreement; (ii) a breach by defendants of any representation, warranty or covenant in the Deed of Trust that remains uncured after any applicable cure period; or (iii) after written notice to defendants, upon the occurrence of any other Event of Default as defined in the Loan Agreement and other loan documents.

To further secure the Loan, PCCA's Preferred Limited Partners, together with a separate partnership of which such Preferred Limited Partners are the sole limited partners (collectively, the "Patriot Guarantors"), executed a "Repayment Guaranty (Limited)" (the "Patriot Guaranty"), which provided that, upon an Event of Default by defendants as defined in the loan documents, the Patriot Guarantors would pay plaintiff up to $16,650,000 of the principal amount due under the Loan, plus accrued interest thereon and certain related expenses.  A true and correct copy of the Patriot Guaranty is attached hereto as Exhibit J.

Prior to the January 2008 closing on the Loan Agreement, plaintiff demanded that the spouses of the individual Patriot Guarantors also sign the Patriot Guaranty.  The individual Patriot Guarantors refused to obtain their respective spouses' signatures on the Guaranty, and plaintiff ultimately agreed to enter into the Loan Agreement and close the transaction without obtaining guaranties from such Guarantors' spouses.[4]

---

[4]     Such demands by plaintiff constitute violations of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691(a), and of the regulations promulgated thereunder by the Board of Governors of the Federal Reserve System, including Regulation B, 12 C.F.R.

6

Plaintiff's Loan to defendants was structured as a syndicated credit facility in which it was contemplated that another Lender or Lenders would advance a portion of the funds committed under the Loan.  As a result, in connection with the Loan Agreement, defendants and plaintiff executed a "Market Flexibility Agreement" which provided, among other things, that plaintiff would attempt to syndicate the Loan during a "Syndication Period" which extended for one hundred and eighty days after the closing of the Loan, and that, if it could not do so, plaintiff's commitment to lend would be reduced to $30 million, in which event defendants would be required to pay to plaintiff, upon thirty days notice, any amounts owing under the Loan in excess of that amount (and that failure by defendants to do so would be an Event of Default under the Loan Agreement).

At the time plaintiff entered into the Loan Agreement with defendants, a professional, independent appraiser prepared an appraisal of the Property (the "Appraisal Report," a true and correct copy of which is attached hereto as Exhibit K), in which he opined that the Property had an "as-is" value, as of September 2007, of $87 million.[5]  *See* Appraisal Report at 3.

Following the Loan closing, plaintiff attempted to syndicate the Loan to Washington Mutual Bank ("WaMu"), but WaMu demanded that certain modifications be made to the Loan, including, principally, that the spouses of the individual Patriot Guarantors become co-guarantors under the Patriot Guaranty.  Plaintiff, in turn, demanded that the individual Patriot Guarantors' spouses provide such guarantees in order to accommodate WaMu, and threatened to call the Loan (to the extent the outstanding balance exceeded $30 million) if such Guarantors'

---

Part 202.  *See, e.g., FDIC v. Medmark, Inc.*, 897 F.Supp. 511 (D. Kans. 1995); *Bank of the West v. Kline*, 2010 Iowa Sup. Lexis 43, *12 (Iowa May 14, 2010) (noting that Regulation B "bars a creditor from requiring the signature of a guarantor's spouse").

[5]     *See* Loan Agreement (Exhibit 1.B to plaintiff's Motion), § 2.1(k) (requiring defendants to deliver a "current Appraisal of the Property" to plaintiff, "[a]t least ten(10) days prior to the closing of the Loan, . . . in form and substance acceptable to [plaintiff]").

spouses refused to sign the Patriot Guaranty.[6]  As of September 2008, the principal balance outstanding under the Loan was approximately $48 million, meaning that plaintiff was holding an $18 million gun to defendants' head.

After the individual Patriot Guarantors, in an exercise of their federally guaranteed rights under ECOA, refused to provide plaintiff with guarantees signed by their respective spouses, plaintiff demanded, in the alternative, that defendants post $10 million of additional cash collateral for the Loan.  Plaintiff thus presented defendants with a Hobson's choice: have the Loan called, and be obligated to pay $18 million within ten days, or post additional cash collateral in the amount of $10 million.  Operating under the economic duress of plaintiff's threat to call the Loan, defendants had no alternative but to post the additional $10 million.

Having presented defendants with such Hobson's choice, and thereby exacted defendants' acquiescence to the additional collateral requirement, plaintiff syndicated a portion of the Loan to WaMu on or about September 19, 2008, at which time the Loan Agreement was amended by a "Modification Agreement" (Exhibit 1.E to plaintiff's Motion).  Among other things, the Modification Agreement amended the Loan Agreement, adding WaMu as a Lender thereunder.[7]

Pursuant to the Modification Agreement, and under economic duress, defendants caused $8,000,000 of their own funds to be deposited into one or more "blocked" bank accounts

---

[6]    Such actions and demands by plaintiff and WaMu constitute violations of ECOA and Regulation B.  *See, e.g., FDIC v. Medmark, Inc.*, 897 F.Supp. 511 (D. Kans. 1995); *Bank of the West v. Kline*, 2010 Iowa Sup. Lexis 43, *12 (Iowa May 14, 2010).

[7]    Less than one week after the execution of the Modification Agreement, WaMu was seized by the U.S. Office of Thrift Supervision, which placed WaMu into the receivership of the Federal Deposit Insurance Corporation ("FDIC").  The FDIC ultimately sold WaMu to J.P. Morgan Chase Bank, N.A. ("JP Morgan"), as a result of which JP Morgan succeeded to WaMu's interest in the Loan Agreement and became a Lender thereunder.  Plaintiff has acted as JP Morgan's Agent with respect to the Loan at all relevant times.

8

controlled and held by plaintiff as Agent for the Lenders (the "Blocked Account"), which funds, upon the occurrence of a "monetary Event of Default" as defined in the Loan Agreement, plaintiff was permitted to apply against the Loan principal.

Pursuant to the Modification Agreement, and under the same economic duress, defendants (or the Patriot Guarantors on defendants' behalf) also delivered to plaintiff an irrevocable standby letter of credit in the amount of $2 million (the "LOC"), upon which plaintiff was permitted to draw only in the event of: (i) any "monetary Event of Default," (ii) a failure by defendants to deliver a renewal or extension of the LOC as required therein, or (iii) if plaintiff reasonably believed that its rights to draw upon the LOC could be in jeopardy.  In the event of occurrences (ii) and (iii), plaintiff was not permitted to retain the funds or to apply them against the Loan principal, but was required instead to deposit such the funds into the Blocked Account.

In addition to the Blocked Account and the LOC (which, together, constitute the additional $10 million of cash collateral which plaintiff extorted from defendants), in late 2008, BUI II deposited $8.325 million into an account controlled by plaintiff (the "Buchanan Collateral") to pre-fund a "springing guarantee" which was due to be funded sometime in 2010 in the event that defendants failed to achieve certain leasing requirements and/or debt coverage ratios.

A "Repayment Guaranty (Limited)" that BUI II gave to plaintiff at the time the Loan Agreement was executed (the "Buchanan Guaranty") provided, like the Patriot Guaranty, that upon an event of default by defendants, BUI II would pay plaintiff up to $16.65 million of the principal amount due under the Loan, plus accrued interest thereon and certain related expenses. BUI II was given the right to discharge itself of any liability under the Buchanan Guaranty by

making, within a specified timeframe, a "principal payment" on the Loan in the amount of

$8.325 million.

As part of the Loan Agreement, plaintiff approved, and the parties incorporated as exhibit

C thereto, a loan budget totaling $66.6 million (*i.e.*, the full amount of plaintiff's original Loan

commitment.  The loan budget provided, *inter alia*, for:

  a.   funds for "general construction" in the amount of $4,662,000;
  b.  a "net interest reserve" in the amount of $8,682,665, to be used by defendants to
      pay interest on the Loan (and any periodic payments owing under any "Swap
      Transaction" with Lenders or their affiliates – in essence, insurance against
      interest rate fluctuations with respect to the Loan); and
  c.  an Operating Expense Reserve in the amount of $1 million, to be used by
      defendants to pay utility and other expenses during the construction and
      renovation of the Property.

The Loan Agreement contains a "Leasing Hurdle" provision, which required defendants

to cause at least 30% of the space within the "Improvements" at the Property to be leased by on

or about April 9, 2009.  The Loan Agreement further provided that a failure by defendants to

achieve the Leasing Hurdle would constitute an event of default:

> within twenty (20) days ***after*** receipt of written notice that such
> obligation was not performed; provided that, if cure cannot
> reasonably be effected within such 20-day period, such failure
> ***shall not be an event of default hereunder*** so long as [defendants]
> promptly (in any event, within ten (10) days after receipt of such
> notice) ***commence***[] cure, and thereafter diligently (in any event,
> within forty-five (45) days after receipt of such notice) prosecute[]
> such cure to completion . . . .

Loan Agreement, § 6.1(d) (emphasis added).

On or about November 17, 2008, defendants entered into a general construction contract

with James G. Davis Construction Corporation ("Davis") to perform certain construction services

including, but not limited to, demolition, concrete work, carpentry, surveying, and installation of

mechanical, electrical, plumbing, heating and fire alarm systems (the "Davis Contract," a true

and correct copy of which is attached hereto as Exhibit L).  Plaintiff knew and understood, and

10

has now admitted, that the Improvements could not be leased unless and until the work provided

for in the Davis Contract was completed.  *See* plaintiff's Motion at 17 ("without approximately

$200,000 in repairs to complete renovations . . . the [] Property will remain vacant and cannot be

leased"); *id.* at 9 (same); *id*. at 21 (same); Exhibit 1 to plaintiff's Motion, ¶23 (same).

Pursuant to the Loan Agreement, defendants furnished plaintiff with a copy of the Davis

Contract.  Plaintiff approved the Davis Contract and committed to fund all sums due and owing

to Davis pursuant to the Loan Agreement and the terms of the Davis Contract.

The Davis Contract provided for a guaranteed maximum price of $3,108,684, subject to

additions and deductions by change order, for the work Davis was to perform, and plaintiff

allocated that amount of the general construction funds in the loan budget for that purpose.  This

sum was later increased by $38,102, pursuant to change orders approved by plaintiff, for a total

of $3,146,786.

Prior to April 9, 2009, but following plaintiff's approval of the Davis Contract, Davis

began to furnish labor, materials, and services in connection with the renovation of the Property.

Pursuant to the procedures set forth in the Loan Agreement, defendants submitted the following

Draw Requests to plaintiff for payment to Davis, which Requests the Bank funded in full:

| Draw Request No. | Date of Request | Amount |
|---|---|---|
| 8 | in or about December, 2008 | $572,787 |
| 9 | on or about January 16, 2009 | $396,729 |
| 10 | on or about February 13, 2009 | $739,078 |
| **Total:** | | **$1,708,594** |

Thus, following the funding of Draw Request No. 10, plaintiff had advanced $1,708,594

of the $3.1 million allocated to the Davis Contract under the approved loan budget, leaving

$1,438,192 under the approved loan budget for completion of the Davis Contract, at which point the space within the Improvements would have been suitable for leasing.

On or about March 16, 2009, defendants submitted Draw Request No. 11 to plaintiff, which included the sum of $409,291 for payment to Davis for work performed prior to that date. A true and correct copy of Draw Request No. 11 is attached hereto as Exhibit M.  On March 30, 2009, plaintiff approved Draw Request No. 11.  True and correct copies of e-mail correspondence demonstrating plaintiff's approval of Draw Request No. 11 are attached hereto as Exhibit N.

Following plaintiff's approval of Draw Request No. 11, including the $409,291 allocated for payment to Davis, plaintiff  abruptly, unlawfully, and without notice, cause, or legal justification, refused to fund any further payments under the Loan Agreement, including payments to Davis for work that it had performed and for work which still needed to be performed in order to render the Property suitable for leasing, which work had previously been approved by plaintiff, and which plaintiff had committed to fund.

As a direct and proximate result of plaintiff's refusal to fund any further payments under the Loan Agreement, the work to be performed by Davis was never completed, and defendants therefore were unable to achieve the Leasing Hurdles set forth in the Loan Agreement.  Davis has placed a mechanic's lien against the Property and has commenced a lawsuit in the Superior Court of the District of Columbia to enforce such lien and for breach of contract.  *See* Complaint attached as Exhibit 1.L to plaintiff's Motion.

As a direct and proximate result of plaintiff's refusal to fund any further payments under the Loan Agreement, property taxes due and owing on the Property (which were to be paid from the proceeds of the Loan) have not been paid, utility bills (which were to be paid from the

proceeds of the Loan) have not been paid (resulting in Water and Sewer Authority Liens being placed against the Property), and certain interest payments (which were to be paid from the proceeds of the Loan) have not been made.

On or about October 21, 2009, after defendants refused to accede to plaintiff's unreasonable and extortionate demands to renegotiate the Loan, plaintiff delivered a letter to defendants and the Guarantors (Exhibit 1.I to plaintiff's Motion) alleging that defendants had defaulted under the Loan Agreement by: (i) failing to achieve the Leasing Hurdle; (ii) failing to pay Davis; (iii) failing to make interest payments; (iv) failing to pay property taxes; and (v) failing to make certain "Swap Transaction" payments purportedly owed to plaintiff.  Plaintiff demanded that Patriot cure the alleged "payment defaults" (*i.e.*, the "interest default" and the "swap payment default") within ten business days or it would accelerate the Loan, and that defendants pay in full all outstanding property taxes within twenty days of the date of the letter, on pain of default.  Plaintiff purported to "reserve its rights" with respect to the purported "leasing default."

*Each and every one of the purported "defaults" alleged by plaintiff in the October 21, 2009 letter were directly and proximately caused – indeed, manufactured – by plaintiff's unlawful refusal to fund any further payments under the Loan Agreement after approving Draw Request No. 11 on March 30, 2009.*

By letter dated February 3, 2010 (Exhibit 1.J to plaintiff's Motion), plaintiff notified defendants and the Guarantors that it had accelerated the Loan, applied all amounts held in the Blocked Account to amounts allegedly owing under the Loan, and drawn on the Letter of Credit and applied the funds to amounts allegedly due and owing under the Loan.  At or about the same

13

time, under threat of liability under the Buchanan Guaranty, BUI II acceded to plaintiff's set-off of the Buchanan Collateral.

Thereafter, plaintiff commenced this action and a separate action in this Court, styled *U.S. Bank, N.A. v. Patriot Equities, L.P., et. al.*, Case No. 1:10-cv-00642-RMU (the "Guarantee Action"), asserting two claims for breach of the Patriot Guaranty.  In this action and the Guarantee Action, plaintiff alleges that, as of April 13, 2010, there was $34,656,707.71 in principal outstanding under the Loan after applying the funds in the Blocked Account, the proceeds of the LOC, and the Buchanan Collateral (a total of $18.325 million) against the Loan's principal.

Lawyers Title recently served defendants with a notice stating that it will sell the Property at a foreclosure sale to be held on June 8, 2010 at the offices of Alex Cooper Auctioneers, Inc, 5301 Wisconsin Avenue, N.W., Suite 750, Washington D.C.  *See* plaintiff's Motion at 17.

Based upon an appraisal of the Property performed within the past twelve months but prior to plaintiff's declaration of defaults under the Loan Agreement, plaintiff's commencement of the two actions in this Court, and Lawyers Title's notice of the foreclosure sale, the value of the Property exceeds $53 million – *i.e.,* it exceeds the principal balance which was owed on the Loan *even before* plaintiff applied the Blocked Account funds, the LOC proceeds, and the Buchanan Collateral.

By unlawfully refusing to fund the Loan and construction expenses required to make the Property suitable for leasing, manufacturing and then declaring bogus "defaults," causing liens to be filed against the Property, causing real estate taxes to go unpaid, commencing this action and the Guarantee Action, and instituting foreclosure procedures, plaintiff has itself breached its obligations under the loan documents (including the Loan Agreement and the Guaranties) and

has significantly devalued the Property.  In thereafter seizing the funds from the Blocked

Account and drawing on the LOC, plaintiff has tortiously converted defendants' property (in the

amount of $10 million). And in demanding that the individual Patriot Guarantors' spouses sign

on to the Patriot Guaranty, plaintiff has violated ECOA, 15 U.S.C. § 1691(a).

III.    **STANDARD OF REVIEW**

The Supreme Court of the United States has long held that "a plaintiff suing in a federal

court must show in his pleading, affirmatively and distinctly, the existence of whatever is

essential to federal jurisdiction; and, if he does not do so, the court, on having the defect called to

its attention or on discovering the same, must dismiss the case, unless the defect be corrected by

amendment. " *Smith v. McCullough*, 270 U.S. 456, 459 (1926).  The Court of Appeals for the

D.C. Circuit has similarly held that

> [a] federal court presumptively lacks jurisdiction in a proceeding
> until a party demonstrates that jurisdiction exists. A party must
> therefore affirmatively allege in his pleadings the facts showing the
> existence of jurisdiction, and the court must scrupulously observe
> the precise jurisdictional limits prescribed by Congress.

*Commodity  Futures Trading Commission v. Nahas*, 738 F.2d 487, 492 n.9 (D.C. Cir. 1984); *see*

*also  Terry v. United States Small Business Administration*, 2010 U.S. Dist. Lexis 30077, *9

(D.D.C. Mar. 29, 2010) ("[u]nder Fed. R. Civ. P. 12(b)(1), . . . a plaintiff bears the burden of

establishing by a preponderance of the evidence that the Court possesses jurisdiction").

"The appointment of a receiver in a diversity case . . . is an extraordinary equitable

remedy that is only justified in extreme situations." *Aviation Supply Corp. v. R.S.B.I. Aerospace,*

*Inc.*, 999 F.2d 314, 316 (8th Cir. 1993).  "Although there is no precise formula for determining

when a receiver may be appointed, factors typically warranting appointment are a valid claim by

the party seeking the appointment; the probability that fraudulent conduct has occurred or will

occur to frustrate that claim; imminent danger that property will be concealed, lost, or diminished

in value; inadequacy of legal remedies; lack of a less drastic equitable remedy; and likelihood

that appointing the receiver will do more good than harm." *Id.* at 316-17; *see also Canada Life*

*Assur. Co. v. LaPeter*, 563 F.3d 837, 844 (9th Cir. 2009) (same); *Brill & Harrington Inv. v.*

*Vernon Sav. & Loan Ass'n*, 787 F. Supp. 250, 253-254 (D.D.C. 1992) (setting forth similar list of

factors to be considered). Appointment of a receiver by a federal court exercising its equity

jurisdiction is appropriate only in an action seeking "a final decree involving the disposition of

property." *Gordon v. Washington*, 295 U.S. 30, 37 (1935). "[T]here is no occasion for a court of

equity to appoint a receiver of property of which it is asked to make no further disposition." *Id*.

As the Supreme Court has held:

> Receiverships for conservation of property "are to be watched with
> jealous eyes lest their function be perverted." This Court has
> frequently admonished that a federal court of equity should not
> appoint a receiver where the appointment is not a remedy auxiliary
> to some primary relief which is sought and which equity may
> appropriately grant. And the reasons for such restraint are
> reinforced where the rights to the property sought to be conserved
> by a receivership are being litigated in a state court.

*Kelleam v. Md. Cas. Co.*, 312 U.S. 377, 381 (1941) (citations omitted). The decision of whether

to appoint a receiver is committed to the Court's sound discretion. *Gordon*, 295 U.S. at 37.

The standard for imposition of a preliminary injunction is well-settled. A preliminary

injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the

plaintiff is entitled to such relief. " *Winter v. NRDC, Inc.*, 129 S.Ct. 365, 376 (2008). It is "never

awarded as of right." *Id.* "A plaintiff seeking a preliminary injunction must establish that he is

likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

public interest." *Id.* at 374. A preliminary injunction "should not be granted unless the movant,

by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972

(1997).  "In particular, a movant must show at the very least that irreparable harm is likely to

occur should an injunction not issue.  The mere possibility of irreparable harm is not enough, and

a court may deny a motion for preliminary relief without considering any other factors when

irreparable harm is not established."  *TD Int'l, LLC v. Fleischmann*, 639 F. Supp. 2d 46, 48

(D.D.C. 2009) (*citing Winter*).  "While the concept of irreparable harm may be difficult to

define, it is abundantly clear that the impending harm must be 'certain and great,' and it must be

'actual and not theoretical.'"  *Id*. (*quoting Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674, (D.C. Cir.

1985)).

## IV.    <u>ARGUMENT</u>

### A.  **THE COMPLAINT FAILS TO AFFIRMATIVELY AND DISTINCTLY ALLEGE ANY WELL-PLEADED FACTS DEMONSTRATING THIS <u>COURT'S SUBJECT-MATTER JURISDICTION</u>**

It is axiomatic that a federal court may not exercise subject-matter jurisdiction over a

dispute under 28 U.S.C. § 1332 unless there is "complete diversity" of citizenship among the

parties.  That is, diversity jurisdiction is not available if any party to an action has the same

citizenship as any adverse party.  *See, e.g., Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806);

*Caterpillar, Inc. v. Lewis*, 519 U.S. 61, 68 (1996) ("[d]iversity must be complete; no plaintiff

may be a citizen of the same jurisdiction as any defendant").

As set forth above, this Court of limited jurisdiction is presumed, as a matter of law, to

lack subject-matter jurisdiction over an action unless and until the plaintiff demonstrates

otherwise.  *CFTC v. Nahas,* 738 F.2d at 492 n.9.  It is plaintiff's burden to "show in his pleading,

affirmatively and distinctly," that complete diversity exists.  *Smith*, 270 U.S. at 459; *see also*

Fed.R.Civ.P. 8(a) ("A pleading that states a claim for relief must contain: (1) a . . . statement of

the grounds for the court's jurisdiction").  Because plaintiff has not done so, its motion must be

denied and this action dismissed.  *See id*.; *see also* Fed.R.Civ.P. 12(h)(3) ("If the court

determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action").

Plaintiff's sole allegations concerning the citizenship of the parties to this action are contained in paragraphs 4 through 7 of its Complaint.  Plaintiff alleges that it is a national banking association organized under the laws of the United States of America, that its headquarters are located in the state of Ohio, and that its principal place of business is located in the state of Minnesota.  Complaint, ¶4.  Plaintiff alleges that each defendant in this action "is a Delaware limited liability company and, upon information and belief, has its principal place of business in Pennsylvania."  *Id.*, ¶¶5-7.

## 1.   Plaintiff Did Not Properly Plead Its Own Citizenship

For purposes of the Diversity Jurisdiction statute, 28 U.S.C. § 1332, "[a]ll national banking associations shall . . . be deemed citizens of the States in which they are respectively located."  28 U.S.C. § 1348.  The Supreme Court has interpreted this to mean that a national banking association is a citizen of the "State designated in its articles of association as its main office."  *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 318 (2006).

Nowhere in its Complaint does plaintiff identify which state is designated in its articles of association as its "main office."  Instead, confusingly, plaintiff asserts that its headquarters is located in the state of Ohio, and that its principal place of business is in the state of Minnesota.  Complaint, ¶4.  Plaintiff has not alleged whether the *main office designated in its articles of association* is in Ohio, Minnesota, or any other state.  Given the national scope of plaintiff's operations, which include offices in California and Illinois, there are simply no facts pleaded in the Complaint from which the Court can draw any conclusions as to plaintiff's citizenship for diversity purposes.  The motion for appointment of a receiver and for a preliminary injunction

must accordingly be denied, and the Complaint must be dismissed.  *See, e.g., Pair v. Bank of America, N.A.*, 2008 U.S. Dist. Lexis 97425, *1–2 (D.D.C. Oct. 10, 2008) (dismissing complaint because "'national banking associations [are] deemed citizens of . . . the State designated in [the bank's] articles of association as its main office.'  A party seeking relief in the district court must at least plead facts that bring the suit within the court's jurisdiction.  Failure to plead such facts requires dismissal of the action." (citations omitted)).

### 2.   Plaintiff Has Failed Properly to Plead Defendants' Citizenship

Likewise, Plaintiff has utterly failed to plead any facts from which the Court can draw any conclusions as to any of the defendants' citizenship for diversity purposes.  Plaintiff alleges that each defendant is a limited liability company, and then makes irrelevant assertions as to each defendant's state of incorporation and principal place of business.  Complaint, ¶¶5-7.  Plaintiff makes no other effort to identify the citizenship of any defendant.

This Court has long held that "non-corporate entities" – including limited liability companies and limited partnerships – "are analogized to partnerships, which carry the citizenship of their members."  *Johnson-Brown v. 2200 M Street LLC*, 257 F. Supp. 2d 175, 178 (D.D.C. 2003) (*citing Carden v. Arkoma Assocs.*, 494 U.S. 185, 195-96 (1990).  *See also Shulman v. Voyou, LLC*, 305 F. Supp. 2d 36, 39 (D.D.C. 2004) (same); *Ulliman Schutte Constr., LLC v. Emerson Process Mgmt. Power & Water Solutions*, 2006 U.S. Dist. Lexis 14897, *15 (D.D.C. Mar. 31, 2006) ("the citizenship of each member of an LLC counts for diversity purposes").

Indeed, one District Court (in a decision relied upon by this Court in *Johnson-Brown*) has gone so far as to state that "the place of organization and principal place of business of a limited liability company are ***irrelevant***, for the relevant citizenship as to a limited liability company is essentially equivalent to . . . the state or states of citizenship of each [of its] member[s]."

19

*Trowbridge v. Dimitri's 50's Diner L.L.C.*, 208 F. Supp. 2d 908, 910 (N.D. Ill. 2002) (emphasis added).  Because the defendants' respective states of organization and principal places of business – which are "irrelevant" to diversity jurisdiction – are the only information pleaded concerning defendants' citizenship, there is simply no basis for this Court to conclude that it may assert jurisdiction over this action.  Plaintiff's motion must accordingly be denied, and the Complaint dismissed.

### B. <u>THIS IS NOT AN ACTION BETWEEN CITIZENS OF DIFFERENT STATES</u>

As set forth above, partnerships and limited liability companies carry the citizenship of each of their partners or members.  Accordingly, the Court must examine the citizenship of each member of the defendant limited liability companies in order to determine defendants' citizenship.  Where a member of a limited liability company is itself a partnership or limited liability company, the Court must examine the citizenship of each partner or member of such member, and so on, until the citizenship of all parties in interest has been identified.  *See, e.g., Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010) ("the citizenship of an LLC is determined by the citizenship of its members. And as with partnerships, where an LLC has, as one of its members, another LLC, the citizenship of unincorporated associations must be traced through however many layers of partners or members there may be to determine the citizenship of the LLC"); *Hart v. Terminex Int'l*, 336 F.3d 541, 543 (7th Cir. 2003) (same).

As set forth above, the sole member of each defendant is PBCC Holdings, a Delaware limited liability company, the sole members of which are PCCA, a Pennsylvania limited partnership, and BUI II, a California Limited Liability Company.

PCCA's sole general partner is Patriot City Center, Inc., a Pennsylvania corporation with its principal place of business in Pennsylvania.  A corporation is a citizen of the state of its incorporation and of its principal place of business.  28 U.S.C. § 1332(c)(1); *see also Hertz Corp.*

*v. Friend,* 130 S. Ct. 1181, 1192 (2010) (holding that a corporation's "nerve center" is its principal place of business).  Patriot City Center, Inc. is thus a citizen of Pennsylvania.  Each and every limited partner of PCCA is a natural person and a citizen and domiciliary of Pennsylvania.  PCCA, therefore, is a citizen of Pennsylvania.

BUI II's members are BSA, a California limited partnership, BI II, a Delaware limited partnership, and CalPERS, a unit of the State and Consumer Services Agency of the State of California.  Through BUI II and PBCC Holdings, CalPERS indirectly owns an **85.44%** beneficial interest in each of the defendant limited liability companies.

BSA's sole general partner is Buchanan Street Partners, Inc., a California corporation with its principal place of business in California (and, thus, a California citizen).  *See*  28 U.S.C. § 1332(c)(1); *Hertz*, 130 S. Ct. at 1192.  BSA's sole limited partners are BCI, a Delaware limited liability company, the Brunswick Trust, and the Ballard Trust.  For purposes of diversity jurisdiction, a trust is a citizen of the state(s) of which each of its trustees is a citizen.  *See Navarro Sav. Ass'n v. Lee,* 446 U.S. 458, 462 (1980).  Here, however, plaintiff has not pleaded, and defendants are not aware of, the identity or citizenship of any member of BCI or any of BI II's limited partners.  Nor did plaintiff plead or are defendants aware of the citizenship of the respective trustees of the Brunswick Trust or the Ballard Trust.  In the absence of any evidence concerning the citizenship of such persons and entities, the presumption that the Court lacks subject-matter jurisdiction requires that the Complaint be dismissed.  *Smith*, 270 U.S. at 459; *CFTC v. Nahas,* 738 F.2d at 492 n.9; *see also* Fed.R.Civ.P. 8(a).

As to the CalPERS interest in BUI II, the Supreme Court long has held that a state, or an "arm of the state," is not a "citizen" of any state within the meaning of 28 U.S.C. § 1332, and that federal courts therefore lack subject-matter jurisdiction to hear a diversity case in which a state

or arm of the state is a party.  *See, e.g., Postal Telegraph Cable Co. v. Alabama*, 155 U.S. 482,

487 (1894) ("A state is not a citizen. . . .  [A] suit between a state and a citizen . . . of another

state is not between citizens of different states, and [a federal court] has no jurisdiction of it

unless it arises under the Constitution, laws, or treaties of the United States."); *State Highway*

*Comm'n v. Utah Constr. Co.*, 278 U.S. 194, 199 (1929) (affirming holding that "the suit, in

effect, is one against the State; a State is not a citizen under the Judiciary Acts; there is no

diversity of citizenship; and no jurisdiction [because the] Commission was but the arm or *alter*

*ego* of the State"); *Moor v. County of Alameda,* 411 U.S. 693, 717 (1973) ("a State is not a

'citizen' for purposes of the diversity jurisdiction. . . .  [A] political subdivision of a State, unless

it is simply 'the arm or *alter ego* of the State,' is a citizen of the State for diversity purposes").

Federal courts have consistently held that CalPERS is an arm of the State of California

and is not a citizen of any state for purposes of federal diversity jurisdiction.  *See, e.g., CalPERS*

*v. Moody's Corp.*, 2009 U.S. Dist. Lexis 110756, *17–18 (N.D. Cal. Nov. 10, 2009) (remanding

to state court action brought by CalPERS, which defendants had removed to federal court,

because "CalPERS is an arm of the state and therefore not a citizen of California for purposes of

federal diversity jurisdiction. Although CalPERS may sue and be sued in its own name, and take

property in its own name, the State has a financial interest in CalPERS' affairs, and it performs a

central government function. . . .  In sum, this Court lacks diversity jurisdiction because the

parties are not citizens of different states."); *CalPERS v. Stride Rite Children's Grp.*, No. 96-

6558, slip op.[8] (S.D. Fla. Dec. 3, 1996) (holding that CalPERS is an arm of the state of California

for purposes of diversity jurisdiction); *Retired Pub. Employees' Ass'n v. Calif.,* 614 F. Supp. 571,

581 (N.D. Cal. 1984) (finding lack of federal jurisdiction to hear "pendant state claim against the

---

[8]      A true and correct copy of this slip opinion is attached hereto as Exhibit O.

state and state officials and agencies" because defendants, including CalPERS, were immune from suit under Eleventh Amendment).

The courts have likewise held that entities similar to CalPERS – other states' employee retirement systems and pension funds – are arms of their respective states and therefore are not citizens of any state and/or are protected by Eleventh Amendment sovereign immunity.  *See, e.g., Missouri State Employees' Retirement Sys. v. Credit Suisse*, 2010 U.S. Dist. Lexis 4633 (W.D. Mo. Jan. 21, 2010) (reviewing decisions concerning non-citizenship of state employee pension funds, and finding lack of federal subject-matter jurisdiction in action to which Missouri's employee retirement system was a party); *American Int'l Specialty Lines Ins. Co. v. Reimer & Koger Assocs.*, 1995 U.S. Dist. Lexis 1383 (D. Kan. 1995) (holding that Kansas Public Employees Retirement System ("KPERS") was necessary party to action under Rule 19(a), that Eleventh Amendment sovereign immunity required dismissal of KPERS from action, and that Rule 19(b) therefore required dismissal of entire action because judgment rendered in KPERS' absence would prejudice KPERS and plaintiff was able to re-file action in state court); *Fitzpatrick v. Bitzer*, 519 F.2d 559, 565 (2d Cir. 1975), *rev'd on other grounds*, 427 U.S. 445 (1976) (holding that Connecticut retirement system was alter ego of the state); *Hair v. Tennessee Consol. Retirement Sys.*, 790 F. Supp. 1358 (M.D. Tenn. 1992) (dismissing action against Tennessee retirement system for lack of subject-matter jurisdiction, because retirement system was an "arm of the state" and was subject to Eleventh Amendment immunity); *Mello v. Woodhouse*, 755 F.Supp. 923, 926 (D. Nev. 1991) (holding that Nevada retirement system was arm of the state); *21 Properties, Inc. v. Romney*, 360 F.Supp. 1322 (N.D. Tex. 1973)  (holding that New York state retirement system was alter ego of the state).

CalPERS, which owns more than 85% of each defendant LLC, is the real party in interest in this action. *See State Highway Comm'n*, 278 U.S. at 200 (finding lack of diversity jurisdiction because state was "the real part[y] in interest"). Because CalPERS is an arm of the state of California, it is not a citizen of any state for purposes of diversity jurisdiction under 28 U.S.C. § 1332. Accordingly, this Court lacks subject-matter jurisdiction over this action and must dismiss the Complaint pursuant to Fed.R.Civ.P. 12(b)(1) and 12(h)(3). Plaintiff's motion must likewise be denied. *See, e.g., Mintzer*, 263 F.2d at 824 ("The appointment of a receiver is an equitable remedy of rather drastic nature available at the discretion of the court having jurisdiction of the subject matter"); 13-66 MOORE'S FEDERAL PRACTICE § 66.04 ("In order to appoint a receiver, a federal court must have subject-matter jurisdiction"); *Sierra Club v. Morton*, 405 U.S. 727, 741 (1972) (affirming order vacating preliminary injunction entered by district court which lacked subject matter jurisdiction); *Citizens Concerned for Separation of Church & State v. Denver*, 628 F.2d 1289, 1301 (10th Cir. 1980) (vacating preliminary injunction entered by district court which lacked subject-matter jurisdiction).

### C. A RECEIVERSHIP AND INJUNCTION WOULD BE INAPPROPRIATE BECAUSE PLAINTIFF SEEKS NO FINAL EQUITABLE RELIEF AND HAS DEMONSTRATED NO LIKELIHOOD OF IRREPARABLE HARM, AND BECAUSE PLAINTIFF CAUSED THE VERY "DEFAULTS" WHICH FORM THE BASIS OF THIS ACTION

#### 1. A Receiver May Not Be Appointed Because Plaintiff Seeks No Final Equitable Relief

The prayer for relief in plaintiff's Complaint seeks:

    a.   appointment of a receiver "during the pendency of this action";

    b.   a preliminary injunction in aid of the receiver *pendente lite*;

    c.   a judgment for money damages; and

    d.   "such other and further relief as this Court deems just and proper."

Complaint at 15-16.  Plaintiff does not seek any permanent injunction or permanent receivership.

It does not seek specific performance of the Loan Agreement or other equitable relief.  And it

does not ask the Court to enter any decree involving the disposition of or title to the Property.

As set forth above, appointment of a receiver by a federal court exercising its equity

jurisdiction is appropriate only in an action seeking "a final decree involving the disposition of

property."  *Gordon v. Washington*, 295 U.S. 30, 37 (1935).  "[T]here is no occasion for a court of

equity to appoint a receiver of property of which it is asked to make no further disposition."  *Id*.

As the Supreme Court has held:

> Receiverships for conservation of property "are to be watched with
> jealous eyes lest their function be perverted."  This Court has
> frequently admonished that a federal court of equity should not
> appoint a receiver where the appointment is not a remedy auxiliary
> to some primary relief which is sought and which equity may
> appropriately grant.  And the reasons for such restraint are
> reinforced where the rights to the property sought to be conserved
> by a receivership are being litigated in a state court.

*Kelleam v. Md. Cas. Co.*, 312 U.S. 377, 381 (1941) (citations omitted).

The *Kelleam* Court's admonition bars the relief plaintiff now seeks.  The *only* final relief

for which plaintiff prays is an award of money damages.  Appointment of a receiver *pendente*

*lite* is not auxiliary or ancillary to plaintiff's claim for money damages – particularly because (as

discussed below) plaintiff is a fully secured lender.  Plaintiff's motion for appointment of a

receiver must be denied for this reason alone.

> **2.  Plaintiff Has Not Established That This Court Should Take the
>      Extraordinary and Drastic Step of Appointing a Receiver**

Plaintiff asserts that a receiver should be appointed because defendants have purportedly

defaulted under the Loan Agreement, because the Property is purportedly worth "far less" than

the amounts purportedly owed on the Loan, because defendants' financial position is

"precarious," and because the appointment of a receiver purportedly risks no injury to

defendants.  Motion at 5-6 & 14-19.  As set forth below, however, any and all "defaults" under the Loan Agreement were orchestrated and caused *by plaintiff*.  Plaintiff cannot now seek relief based on "defaults" which were directly and proximately caused by plaintiff's own material breaches of the Loan Agreement and other Loan Documents.  Plaintiff has offered *no evidence* regarding the value the value of the Property or the financial position of defendants; instead, it has merely offered unsupported allegations and conclusions.  Nor has plaintiff demonstrated any injury it may suffer in the absence of a receiver, nor any lack of injury which defendants will suffer by reason of the imposition of a receivership for defendants' principal assets.  In short, plaintiff has failed to meet its burden of demonstrating the necessity of the extraordinary and drastic remedy of receivership.

### a.   Plaintiff is a Fully Secured Creditor

The decisions cited by plaintiff in support of its motion for appointment of a receiver state that the "most important . . . factors" to be considered by the Court on such a motion "are the adequacy of the security and the financial position of the mortgagor."  *N.Y. Life Ins. Co. v. Watt W. Inv. Corp.*, 755 F. Supp. 287, 292 (E.D. Cal. 1991); *see also Fannie Mae v. Maple Creek Gardens, LLC*, 2010 U.S. Dist. Lexis 5342, *7 (E.D. Mich. Jan. 25, 2010) ("Courts contemplating the appointment of a receiver have considered a number of factors but have found the adequacy of the security and the financial position of the mortgagor to be most important").

At the time plaintiff entered into the Loan Agreement with defendants, a professional, independent appraiser prepared an appraisal of the Property, in which he opined that the Property had an "as-is" value, as of September 2007, of $87 million.[9]  *See* Appraisal Report (Exhibit K

---

[9]      *See* Loan Agreement (Exhibit 1.B to plaintiff's Motion), § 2.1(k) (requiring defendants to deliver a "current Appraisal of the Property" to plaintiff, "[a]t least ten(10) days prior to the closing of the Loan, . . . in form and substance acceptable to [plaintiff]").

hereto) at 3.  Plaintiff admits that it agreed in January 2008 to loan $66.6 million to defendants, to be secured by this $87 million Property.[10]  Plaintiff alleges that defendants now owe approximately $39 million on that loan, which remains secured by the Property.  *See* Plaintiff's Motion at 15.  Plaintiff alleges that a receiver is necessary because "the present fair market value of the Warehouse Property, which constitutes U.S. Bank's security interest for its Loan, is worth far less than the amount owed by Defendants."  *Id.*

Inexplicably, plaintiff fails to advise the Court that plaintiff has filed a separate action in this Court against certain guarantors of the loan, in which it asserts that such guarantors, who are contractually obligated to maintain a combined tangible net worth of not less than $50 million, are personally liable to plaintiff for more than $11.34 million of the $39 million purportedly owed by defendants herein.[11]  Given such guarantors' purported personal liability of more than $11.34 million, the Property would have to be worth less than $27.7 million to be insufficient security for the amounts purportedly owed by defendants herein.

At least three times in its Motion, plaintiff asserts that the Property's current fair market value has declined from approximately $88 million in January 2008 to less than $27.7 million (or $39 million) today.  *See* Plaintiff's Motion at 1, 9, and 15.  The only "fact" or "evidence" offered by plaintiff in support of their burden of persuading the Court as to the Property's present value is the affidavit of Ziad W. Amra (Exhibit 1 to the Motion).  *See* Motion at 9 and 15.  According to his affidavit, Mr. Amra is "a Vice President of the Special Assets Group" of plaintiff, and is "responsible for managing distressed credit facilities of the bank."  Amra Affidavit, ¶2.  Mr.

---

[10]     *See* Complaint, ¶¶10-11; *see also* Purchase Money Deed of Trust Promissory Note dated January 9, 2008 (Exhibit 1.C to plaintiff's Motion).

[11]     *See* Complaint in *U.S. Bank, N.A. v. Patriot Equities, L.P. et al.*, No. 1:10-cv-00642-RMU, a true and correct copy of which is attached hereto as Exhibit P, ¶¶43 & 47; Patriot Guaranty (Exhibit J hereto), § 12(b) ("Guarantor shall maintain at all times a combined, aggregate Tangible Net Worth of not less than Fifty Million and No/100 Dollars").

Amra attached a ream of exhibits to his affidavit, but inexplicably failed to attach any appraisals

of the Property (including the above-referenced $88 million appraisal)  or any other documents

from which the Court can draw any conclusions as to the Property's value.  Instead, Mr. Amra

simply repeats the conclusory assertion contained in plaintiff's Motion that "U.S. Bank's security

for its Loan – the Property – is inadequate to satisfy the amount due and owing by Defendants."

*Id.*, ¶23.  *Nothing* in Mr. Amra's affidavit or elsewhere in the record supports this contention (or

even purports to support it).  Mr. Amra does not allege that he has any expertise in the valuation

of real property, that he has ever visited the Property, nor even that he has consulted with a

qualified appraiser or reviewed any appraisals of the Property prepared at any time.  There is

simply no reason – and none offered – for the Court to give any credit to the assertions of a

Minnesota-based[12] middle manager regarding the present value of industrial real estate in the

District of Columbia.

Plaintiff has failed *in toto* to carry its burden of establishing that its security interest in the

Property would be insufficient to satisfy the purported amount of defendants' debt.  Given

plaintiff's status as a fully secured lender, there is simply no emergency – and no likelihood of

irreparable harm – that justifies the drastic and extraordinary remedy of a receivership.

### b. Plaintiff's Only Evidence of Defendants' Purported Financial Distress Consists of "Defaults" Which Were Caused by Plaintiff's Material Breaches of the Loan Agreement

Plaintiff asserts that appointment of a receiver is necessary because defendants have

failed to achieve the Leasing Hurdles, "failed to pay when due all monies due and owing to"

---

[12]    *See* Amra Affidavit (Exhibit 1 to plaintiff's Motion) at 6 (showing that Mr. Amra signed his affidavit in Minnesota, which is the situs of plaintiff's principal place of business, as pleaded in the Complaint, ¶4); *see also United States v. Veltman*, 9 F.3d 718 (8th Cir. 1993) (noting Mr. Amra's appearance as counsel of record in appeal from United States District Court for the District of Minnesota).

plaintiff, and have failed to pay bills owed to Davis (resulting in Davis's filing of a mechanic's lien and a lawsuit to enforce such lien), as well as utility bills (resulting in the filing of Water & Sewer Authority Liens) and real estate taxes.  *See* plaintiff's Motion at 15-16 and 5-10.  What plaintiff fails to mention is that each and every one of these purported "defaults" by defendants was factually and proximately caused by plaintiff's own material breaches of the Loan Agreement.

The purpose of the Loan Agreement was to provide defendants with the funds necessary to redevelop the Property and make it suitable for leasing or sale to third parties.  *See* Loan Agreement, § 1.1 ("Lender . . . agrees to lend to Borrower . . . the proceeds of the Loan, from time to time, . . . for the purpose of refinancing the acquisition costs of the Property, leasing the Improvements, performing the Renovations, paying interest on the Loan, and otherwise paying the approved costs set forth in the Sworn Construction Cost Statement").  Specifically, the Loan Agreement provides that:

> a.  Interest on the Loan shall be paid from the proceeds of the Loan (*id.*, § 3.1, Fourth Paragraph);
>
> b.  Construction costs (including amounts payable under the Davis Contract) shall be paid from the proceeds of the Loan (*id.*, § 3.6(c));
>
> c.  Real estate taxes shall be paid from the proceeds of the Loan (*id.*, § 3.6(h)); and
>
> d.  Other indirect (non-construction) items (including, without limitation, utility bills) shall be paid from the proceeds of the Loan (*id.*).

*See also id.*, § 5.6 (setting forth permitted uses of Loan proceeds, including payment of construction costs, leasing costs, and "incidental costs and expenses").

As set forth above, plaintiff's unlawful and unjustified failure to fund Draw Request No. 11 – which constituted a material breach of plaintiff's obligations under the Loan Agreement – directly caused defendants' inability to pay Davis, which resulted in Davis's filing of a

mechanic's lien and a lawsuit to enforce such lien.  Plaintiff's failure to fund Draw Request No. 11 caused defendants to be unable to pay certain utility bills, resulting in the filing of the Water & Sewer Authority Liens.  Plaintiff's failure to fund Draw Request No. 11 left defendants with insufficient funds to pay the real estate taxes that were due and owing with respect to the Property.  And plaintiff's failure to fund Draw Request No. 11 left defendants with insufficient funds to pay the interest due on the Loan and the swap transaction payments which, plaintiff contends, were necessary to avoid default under the Loan Agreement.

Each and every one of these "defaults" by defendants was directly and proximately caused by plaintiff's own material breach of the Loan Agreement.  After these purported "defaults" occurred, plaintiff purported to accelerate the principal balance of the loan, demanding immediate payment of the full amount outstanding.  *See* plaintiff's Motion at 8.  Defendants' failure to immediately pay the full principal of the Loan – some $34.7 million, according to plaintiff – is alleged by plaintiff to be a further default.  But defendants cannot be held liable by plaintiff for "defaults" which plaintiff unilaterally engineered for its own purposes.  *See, e.g., Rosenthal v. Sonnenschein Nath & Rosenthal, LLP,* 985 A.2d 443, 452 (D.C. App. Ct. 2009) (it is a "basic principle of contract law" that a party "is excused from performance under a contract if the other party is in material breach thereof").

Plaintiff likewise admits that defendants' purported failure to achieve the Leasing Hurdles was caused by plaintiff's own failure to release the funds which plaintiff was obligated to release under the Loan Agreement; plaintiff repeatedly concedes in its Motion that the Property could not and cannot be leased unless and until the construction work which Davis was to perform is completed.  *See* plaintiff's Motion at 17 ("without approximately $200,000 in repairs to complete

renovations . . . the [] Property will remain vacant and cannot be leased"); *id.* at 9 (same); *id.* at 21 (same); Exhibit 1 to plaintiff's Motion, ¶23 (same).

Plaintiff nevertheless brazenly asserts that defendants' purported "defaults" are evidence that defendants' financial position is "precarious," necessitating the appointment of a receiver. Nothing could be further from the truth. Defendants' financial position would not be "precarious" if plaintiff were to honor its legal, contractual commitment to loan $66.6 million to plaintiff to be used for the rehabilitation and leasing of the Property. That is the bargain which plaintiff struck and which plaintiff has now unilaterally and materially breached. The Loan proceeds – to which defendants have a legal right – are more than adequate to pay all expenses of the Property, including the amounts owed and to be paid to Davis, to the Water & Sewer Authority, and for the Property's real estate taxes. The payment of such Loan proceeds would enable Davis to complete its construction work at the Property, rendering the Property suitable for leasing. If defendants' financial position is "precarious," it is only because plaintiff has made it so by breaching its obligations under the Loan Agreement. Plaintiff's unclean hands bar it from seeking the extraordinary and drastic equitable remedy of appointment of a receiver.

### c. Plaintiff's Request for a Preliminary Injunction Should Be Denied for the Same Reasons

Plaintiff concludes its Motion with a request for an extraordinarily broad preliminary injunction in aid of the prayed-for receivership. *See* plaintiff's Motion at 19-23. Because a receivership would be inappropriate, as set forth above, there is no reason for the Court to impose such an injunction. In particular, as plaintiff states, a party seeking a preliminary injunction must establish "a substantial likelihood of success on the merits" and a likelihood of "irreparable harm to the movant." *Id.* at 20 (*quoting Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009)). As set forth above, this Court's lack of subject-matter

jurisdiction, combined with plaintiff's own material breaches of the Loan Agreement, will be fatal to *any* likelihood that plaintiff will succeed on the merits.  And plaintiff – who has the burden of persuasion on its Motion – has not presented the Court with an iota of evidence concerning the value of the Property.  The only evidence of the Property's value which is in the record is the Appraisal Report (Exhibit K hereto), which opines that the Property had an "as is" value, as of September 2007, of $87 million.  This leads ineluctably to the conclusion that plaintiff is a fully-secured creditor and is in no danger of suffering any harm, much less irreparable harm, in the absence of extraordinary equitable relief.

I.      **CONCLUSION**

For all of the foregoing reasons, defendants Patriot-BSP City Center II, LLC, Patriot-BSP City Center III, LLC, and Patriot-BSP City Center IV, LLC respectfully request that plaintiff's Motion for Appointment of a Receiver and for a Preliminary Injunction be denied, and that plaintiff's Verified Complaint and Petition for Appointment of a Receiver be dismissed in its entirety.  In the event that the Court believes that it has subject-matter jurisdiction, and is therefore inclined to entertain plaintiff's Motion on the merits, defendants request an opportunity to be heard in opposition to the Motion.

Respectfully submitted,

**KASS, MITEK & KASS, PLLC**

BY:   \_\_\_/s/  Benny L. Kass
Benny L. Kass (D.C. Bar No. 025155)
1050 Seventeenth Street, N.W., Suite 1100
Washington, D.C. 20036-5596
(202) 659-6500
*Attorneys for Defendants Patriot-BSP City*
*Center II, LLC, Patriot-BSP City Center III, LLC,*
*and Patriot-BSP City Center IV, LLC*

Dated: May 24, 2010

32

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
Civil Division**

———————————————————— :
                                                                    :
U.S. BANK NATIONAL ASSOCIATION,        :        C.A. No. 1:10-cv-00678-HHK
                                                                    :
            Plaintiff,                                       :
                                                                    :
      v.                                                        :
                                                                    :
PATRIOT-BSP CITY CENTER II, LLC, *et al.,*    :
                                                                    :
            Defendants.                                   :
———————————————————— :

## <u>ORDER</u>

AND NOW, this ___ day of _____, 2010, upon consideration of plaintiff's

Motion for Appointment of a Receiver and for a Preliminary Injunction, all papers submitted in

support thereof and in opposition thereto, and GOOD CAUSE APPEARING THEREFOR, it is

hereby

ORDERED and DECREED that said motion be and hereby is DENIED and, further, that

plaintiff's Verified Complaint and Petition for Appointment of a Receiver be and hereby is

DISMISSED.

BY THE COURT:


_____
Hon. Henry H. Kennedy, U.S.D.J.


Copies to:

Benny L. Kass, Esq.                              M. Roy Goldberg, Esq.
Kass, Mitek & Kass, PLLC                    Sheppard Mullin Richter & Hampton LLP
1050 Seventeenth Street, NW             1300 I Street, NW
Suite 1100                                            11th Floor-East
Washington, D.C. 20036-5596            Washington, D.C. 20005